# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROGER HILL**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:05CV00020 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL HOLLAND, TRUSTEE,** | ) | By: James P. Jones |
| **ET AL.,** | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

*Roger W. Rutherford, Wolfe, Williams & Rutherford, Norton, Virginia, for Plaintiff; Charlie R. Jessee, Jessee, Read & Ely, P.C., Abingdon, Virginia, and Christopher F. Clarke, Office of the General Counsel, UMWA Health & Retirement Funds, Washington, D.C., for Defendants.*

In this action seeking disability pension benefits from the United Mine Workers of America 1974 Pension Trust, I find that the trustees did not abuse their discretion and affirm their decision denying the plaintiff's claim.

## I. BACKGROUND.

Plaintiff Roger Hill filed this action on September 15, 2005, challenging the final decision of the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") denying his claim for a disability pension under the provisions of the

United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"). The defendants ("Trustees") are the trustees of the 1974 Pension Trust and plan administrators and fiduciaries of the 1974 Pension Plan. Hill's cause of action arises under the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001-1461 (West 1999 & Supp. 2005) ("ERISA"), and jurisdiction of this court exists pursuant to 29 U.S.C.A. § 1132(f).

The defendant Trustees have filed the record of their determination of Hill's claim for a pension,[1] and the parties have briefed cross-motions for summary judgment based on that record, pursuant to Federal Rule of Civil Procedure 56. The case is thus ripe for decision.

## II. STANDARD OF REVIEW.

The standard of review of a decision made by fiduciaries of an ERISA-controlled benefit plan generally is de novo. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan gives the fiduciaries discretion to determine benefit eligibility or to construe plan terms, however, the standard of review is whether the trustees abused their discretion. *See Booth v. Wal-Mart Stores, Inc.*

---

[1] The plaintiff's pension file, which is kept by the Trustees and upon which they determined his claim, is hereafter referred to as "R." The plaintiff does not dispute the authenticity or completeness of the copy of the pension file submitted to the court.

*Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). In considering the reasonableness of a fiduciary's discretionary decision, the court may consider the following factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43.

The Fourth Circuit has adopted the abuse of discretion standard of review for decisions under the 1974 Pension Plan. *See Boyd v. Trustees of the United Mine Workers Health & Retirement Funds*, 873 F.2d 57, 59 (4th Cir. 1989). In exercising their discretion under the 1974 Pension Plan, the Trustees are obligated to pay legitimate claims and to guard trust assets against improper ones. *See Sargent v. Holland*, 114 F.3d 33, 35 (4th Cir. 1997). If substantial evidence supports the Trustees' decision, then the determination must be affirmed. *See Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). "Substantial evidence . . . is evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Such evidence consists of "more

- 3 -

than a mere scintilla of evidence but may be somewhat less than a preponderance."

*Id.*

The 1974 Pension Plan defines the relevant eligibility requirements for a disability pension and states:

> A Participant who . . . becomes totally disabled as a result of a mine accident . . . shall, upon retirement . . . be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits . . . .

1974 Pension Plan, art. IIC. (Mem. Supp. Defs.' Mot. Summ. J. Ex. B at 5.)

Accordingly, a claimant seeking a disability pension under the 1974 Pension Plan must establish that (1) he was involved in a mine accident, (2) he has been awarded social security disability insurance ("SSDI") benefits, and (3) the SSDI award was based on a disability caused by the mine accident. The mine accident must have "proximately caused" or be "substantially responsible" for the disability, even though it may have acted in combination with a previous or subsequent condition. *Boyd*, 873 F.2d at 59-60; *Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir. 1988).

Under the deferential standard applicable to this case, the court is limited to the evidence that was before the Trustees at the time of their decision. *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994).

- 4 -

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Where the court must decide the case on the basis of an administrative record, the summary judgment motion "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F. Supp. 1107, 1110 (W.D. Va. 1994), *aff'd*, No. 94-1496, 1995 WL 449668 (4th Cir. July 31, 1995) (unpublished). Because the factual record is closed, the "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits." *Id.* "To survive summary judgment, then, plaintiff must point to facts in the administrative record—or to factual failings in that record—which can support his claims under the governing legal standard." *Id.*

## III. FACTS.

Hill worked as a truck driver for Clinchfield Coal Company from September 7, 1971, until April 27, 1977. On or about December 1, 1975, Hill injured his back at work while lifting a transmission in Clinchfield's shop. Hill continued to work for nearly a month after the injury, then took off work from January 7, 1976, through

- 5 -

October 11, 1976.  He returned to Clinchfield on October 12, 1976, and remained there until his last day of work on April 27, 1977.

A.  MEDICAL HISTORY.

Hill first sought medical treatment for his back on January 6, 1976, when he received an X ray of his lumbosacral spine.  The X-ray report stated that it was a "normal examination."  William A. Davis, M.D., the attending physician who first treated Hill, filled out a Department of Workmen's Compensation report on January 7, 1976.  In this report Dr. Davis diagnosed back strain and recommended a treatment plan consisting of rest, heat, Valium, and Empirin Compound #3 for pain.  Dr. Davis recommended that Hill not return to work until January 18, 1976, and indicated that he did not believe Hill would have any permanent disability arising from the strain.

On January 17, 1976, Hill returned to Dr. Davis's office with complaints of lower thoracic back pain, and  Dr. Davis referred him to Jack D. Wycoff, M.D.  Hill was admitted to Johnston Memorial Hospital under the care of Dr. Wycoff on January 19, 1976, and was discharged  on January 21, 1976.  In the discharge summary, Dr. Wycoff diagnosed "[i]nterspinous bursitis and dorsolumbar strain, presumed post traumatic" as well as "[o]steoarthritis, T-6 through T-9, presumed to be secondary to old juvenile epiphysitis" and "duodenitis."  (R. 35.)  Dr. Wycoff also noted that Hill

- 6 -

had "improved symptomatically with rest and conservative treatment" and would probably "continue to improve spontaneously." (R. 35.) Dr. Wycoff indicated in the discharge summary that Hill was seen in orthopedic consultation by James Gardner, M.D., as well, who agreed that Hill had interspinous bursitis and felt that X rays "revealed a mid-thoracic kyphosis . . . [that] was probably secondary to an old juvenille epiphysitis." (R. 35.)

Hill returned to Dr. Davis on both January 28 and February 11, 1976, stating that his back had not improved. Dr. Davis referred Hill to Dr. Gardner, and on February 19, 1976, Hill went to Dr. Gardner complaining of discomfort in his lower back and left leg intermittently. In a letter to Dr. Davis summarizing the examination, Dr. Gardner wrote that he was unable to "make a diagnosis of an HNP problem or anything other than back sprain and strain at this time." (R. 38.) He noted that Hill had a full range of motion in his spine and had no neurological deficits in his lower extremities. He was hopeful that "over the next several weeks he will make a satisfactory recovery from this problem and be able to resume work activities." (R. 38.)

Hill returned to Dr. Davis in July and December of 1976 with complaints of continued back pain. Dr. Davis noted tenderness of the spine at T-11 and T-12. On February 7, May 2, and May 11, 1977, Hill visited Dr. Davis citing the back pain,

numbness in the left leg and arm, and "nerves . . . very bad," coupled with depression. (R. 30.) Dr. Davis referred Hill to Pierce D. Nelson, M.D., a psychiatrist, for a mental examination.

Dr. Nelson summarized the results of the mental examination in a letter to Dr. Davis dated May 18, 1977. He noted that Hill cited back pain as his main trouble. He further explained that Hill became more depressed after his back injury in 1975, but that he had some problems with his nerves before that time. Dr. Nelson diagnosed neurotic depressive reaction and further explained that there were "obvious problems related to back injury and back function and back pain along with . . . atrophy of his left lower leg." (R. 62.) Dr. Nelson prescribed regular group therapy for Hill's depression and opined that Hill was unable to work at the time. On May 31, 1977, Dr. Nelson interpreted an MMPI profile of Hill as showing "depressive characteristics and problems of hypochondricals" and noted that Hill's "overall functioning is consistent with our diagnosis of a neurotic depressive reaction . . . with problems of old back injury." (R. 63.)

On November 8, 1977, J.A. Pettigrew, M.D., examined Hill with respect to his complaints of back pain and numbness in his left arm and leg. In Dr. Pettigrew's report of the examination, he explained that Hill recounted the events of December 1, 1975, and his subsequent treatment. Dr. Pettigrew concluded that, although the pain

- 8 -

that Hill indicated in his upper lumbar region limited motion of the low back in flexion by about fifty percent, Hill's "neurologic examination [was] essentially negative entirely" and there was "no evidence of spinal nerve root compression." (R. 57.)

Throughout 1978, Dr. Nelson wrote a series of letters regarding Hill's mental condition. In a letter to Hill's attorney dated February 6, 1978, Dr. Nelson indicated that Hill had a chronic back problem and significant mental illness that had not achieved remission at the time of Hill's last examination and group therapy session on January 1, 1978. He noted that Hill had continued difficulties at home and had not been able to function outside of the home. In another letter to Hill's attorney dated May 23, 1978, Dr. Nelson stated that Hill had been diagnosed with neurotic depressive reaction that was moderately severe, with obvious problems relating to his back injury. He further noted that Hill had been participating in group therapy regularly. Dr. Nelson opined that Hill was disabled and it was doubtful he would improve substantially enough to return to any kind of regular productive employment. In a June 5, 1978, letter to Hill's attorney, Dr. Nelson explained that the MMPI profile was a valid test that supported his diagnosis of a neurotic depressive reaction. He noted that it was a test routinely given to support psychiatric diagnosis in conjunction with patients with low back pain, strain, and injury. Lastly, in a letter to the

Department of Social Services dated December 2, 1978, Dr. Nelson again stated that Hill was diagnosed with neurotic depressive reaction with problems related to back injury and back function. He explained that the MMPI confirmed the diagnosis and stated that Hill was being treated with medication and psychotherapy on a regular basis since his initial visit in 1977.

On April 26, 1978, Everett L. Haas, M.D., performed a mental examination of Hill. Hill complained to Dr. Haas of nervousness, headaches, sleeplessness, and numbness in his left side, and alleged that these symptoms started after his 1975 injury. Dr. Haas thought that Hill's "complaints were very mild and not convincing" and noted that there were no signs of anxiety or depression visible during the examination. (R. 46.) Dr. Haas concluded that Hill displayed no signs of abnormal mental content. Dr. Haas believed that Hill was "a good candidate for vocational rehabilitation training" and was "not disabled in regard to his ability to work." (R. 46.)

Clinical psychologist Carl McGraw, Ph.D., also performed a psychological evaluation of Hill. He summarized his findings in a June 10, 1978, letter to Hill's attorney. Dr. McGraw found that Hill did "have an abundance of anxiety" and was "focused on his body to such an extent that he can hardly think of anything else." (R. 68.) According to Dr. McGraw, Hill had little capacity for dealing with stressful

- 10 -

situations and had neurosis that had approached a severe level at the time of the examination. Dr. McGraw further noted that Hill's I.Q. was within the borderline defective range and that he seemed dull intellectually. Dr. McGraw concluded that Hill was unable to compete in the job market due to limited intelligence and severe psychoneurosis.

Stephen Fulmer, Ph.D., a clinical psychologist, examined Hill on June 19, 1978, for an intellectual, personality, and organic brain damage assessment. Dr. Fulmer found that Hill's major problem was his back injury, which was causing him to have nervous problems. It was Dr. Fulmer's opinion that Hill's intellectual functioning is significantly higher than his test results reflected and that mental retardation should not be considered a disabling factor.

On July 7, 1978, J. G. McFaddin, M.D., gave Hill an orthopedic evaluation for his back problems. In his report to the Disability Determination Division, Dr. McFaddin diagnosed a mild developmental dorsal round back with slight accentuation in the lumbar curve. Dr. McFaddin noted that Hill's active and passive motion in all planes was well within normal limits and that there was no palpable muscle abnormality, spasm, or guarding. Dr. McFaddin concluded that Hill had no significant orthopedic impairment.

Dr. Davis saw Hill again on August 29, 1978, and summarized his findings in a letter dated October 9, 1978. He stated that he found nothing of any significance during the examination. He noted that there was no neurological evidence of disc disease and indicated that Hill seemed fine mentally. Dr. Davis concluded that he would "lean toward the feeling that Mr. Hill would be able to do some type of work." (R. 32.)

During 1980, Dr. Nelson wrote another series of letters regarding Hill's mental condition. In a letter dated January 17, 1980, to Disability Determination Services, Dr. Nelson recounted his diagnosis of "neurotic depressive reaction and obvious problems relating to old back injury and back strain and back pain." (R. 71.) He also noted that Hill had "some structural change and atrophy of his left leg." (R. 71.) Dr. Nelson anticipated "continued disability over the next year to 18 months at least." (R. 71.) On May 19, 1980, Dr. Nelson wrote a letter to Hill's attorney stating that Hill's diagnosis remained the same and that it was unlikely Hill would regain his "economic usefulness." (R. 72.) Dr. Nelson also noted that Hill had borderline mental deficiency, a high level of anxiety, and hypochondrial complaints. On May 22, 1980, Dr. Nelson wrote to the Department of Social Services, informing them that Hill suffered from "a serious mental illness" and had been in treatment since May of 1977. In a letter to Hill's attorney dated September 30, 1980, Dr. Nelson wrote that Hill had

at times expressed an interest in returning to work, but Dr. Nelson did not think he would be able to do so. He noted that Hill had been functioning reasonably well in group therapy and with medication.

On February 20, 1980, Hill was examined by Tillou Henderson, M.D. In the report to Disability Determination Services, Dr. Henderson noted that Hill's "mentality [did] not seem to be markedly involved, although he was a little belligerent at having another disability evaluation and seemed a little bit slow in his response to questioning." (R. 51.) An X ray performed during this exam showed that Hill had degenerative changes at both hip joints and mild degenerative spurring a the L4/L5 level. The X ray showed "[n]o definite evidence of acute or recent bone trauma" and there was no evidence of acute compressive change. (R. 53.) Dr. Henderson noted that Hill complained of pain when doing straight leg raises at ten degrees but concluded that there was not much to be found objectively other than the X-ray findings relating to his hips.

Dr. Nelson continued to write letters regarding Hill's mental condition during 1981 and 1982. On November 11, 1981, Dr. Nelson wrote to the Virginia Department of Social Services, noting that Hill had chronic anxiety and depression relating to an old back injury and back pain. In a letter to Hill's attorney on November 25, 1981, Dr. Nelson described Hill's mental state as stable while involved in regular treatment

- 13 -

but subject to deterioration under stress. In another letter to Hill's attorney dated June 1, 1982, Dr. Nelson described an MMPI profile of Hill that revealed depression, psychoticism, and hysteria. Dr. Nelson opined that Hill was unlikely to ever improve to the point where he could independently support himself.

On May 26, 1983, Marshall D. Tessnear, Ph.D., and James Eden, M.D., performed psychiatric evaluations of Hill. Dr. Tessnear, a clinical psychologist, found that Hill's mental functioning was in the "Borderline Range of Intellectual Ability." (R. 41.) Dr. Eden found that Hill "developed anxiety symptomotology since experiencing a back injury." (R. 44.) Dr. Eden diagnosed generalized anxiety disorder with a few depressive symptoms. Dr. Eden concluded that Hill's anxiety coupled with mild mental retardation would make it very difficult for Hill to obtain and sustain any gainful employment.

In a letter to Hill's attorney dated December 13, 1983, James A. Cross, M.D., wrote a letter summarizing his treatment of Hill spanning from 1980 through 1983. He noted that he had seen Hill for a variety of complaints including peptic symptomotology in 1980, cervical sprain in 1981, and lumbosacral strain in 1983 that responded to treatment. Dr. Cross believed that Hill's "main problem is due to his low or dull normal intelligence and mental problems causing difficulty in relating to other people or performing fairly simply tasks." (R. 54.)

- 14 -

B. Workers' Compensation Benefits.

On January 6, 1977, the Industrial Commission of Virginia entered an order approving a settlement agreement between Hill and Clinchfield Coal Company. In this agreement, Hill alleged that he sustained a back injury at work on December 1, 1975. Clinchfield denied Hill's allegation but agreed to pay a lump sum of $1,000 for Hill's alleged work incapacity between January 6, 1976, and October 11, 1976. Clinchfield sent Hill a check in the amount of $1,000 on January 12, 1977, which constituted full and final settlement of all claims relating to the alleged December 1, 1975, accident.

C. Social Security Disability Insurance Award.

On August 23, 1979, a Social Security administrative law judge ("ALJ") found that Hill was disabled as of September 21, 1978, due to severe emotional impairment and low IQ. On May 2, 1980, the Social Security Administration informed Hill that his disability ceased as of September 1979. Hill challenged the loss of benefits and eventually appealed the denial to the United States District Court. The court found that there had not been an adequate determination of Hill's disability and remanded the case for consideration of additional medical evidence of Hill's emotional status.

On remand, the ALJ concluded that the medical evidence established that Hill

- 15 -

had a chronic anxiety problem, a chronic depressed condition, and mental retardation. The ALJ described Dr. Nelson's diagnoses as "[n]eurotic depressive reaction with problems related to back injury and back function, and a borderline mental deficiency with a high level of anxiety and hypochondrial complaints." (R. 117.) The ALJ also noted that reports of regular medical doctors and orthopedists indicated that Hill did "not appear to have any severe physical problems, although in an X ray taken February 1980 there was demonstrated degenerative change in both his hip joints with calcific bursitis." (R. 117.)

D. Disability Pension Application.

Hill applied for a disability pension from the 1974 Pension Plan on July 16, 1996, claiming that he was disabled as the result of the alleged mine accident on December 1, 1975. There were difficulties in obtaining documentation of the alleged accident as well as Hill's medical records, and on February 28, 2001, the Trustees denied Hill's pension application based on a review of the few treatment records that Hill was able to provide. The Trustees found that the information in the file did not establish a causal link between his alleged mining accident and his disability, and noted that the file did not contain any records related to Hill's anxiety and depression.

On May 13, 2001, Hill requested an administrative appeal of the Trustees'

- 16 -

denial. The Trustees granted the appeal and informed Hill that he could submit additional medical information to establish that a mine accident caused his disability. Hill failed to submit any additional records, and, on August 22, 2001, the Trustees again denied Hill's application for benefits based on his failure to demonstrate that the mine accident caused his disabling anxiety, depression, and mental retardation.

Hill's attorney submitted additional medical records for the Trustees' consideration on November 13, 2003. Nonetheless, on December 1, 2004, the 1974 Pension Trust again denied Hill's application on the grounds that Hill failed to establish the requisite causal link between the accident and his disabling condition. Specifically, the Disability Pension Analyst found that there was a significant delay between the December 1, 1975, mine accident and the first complaint of lower back and leg pain on February 19, 1976. She noted that several orthopedic reports found no objective evidence of orthopedic impairment in Hill's lower back and also emphasized the fact that the Social Security ALJ had found that Hill had no severe physical problems. The analyst ultimately found that the lack of connection between Hill's December 1, 1975, back injury and his ongoing complaints of back pain made it impossible for her to find a connection between Hill's mental problems and the alleged accident.

# IV. ANALYSIS.

The issue before the court is whether the Trustees' decision that the December 1, 1975, mine accident was not substantially responsible for Hill's disability constituted an abuse of discretion. A decision does not constitute an abuse of discretion if it was supported by substantial evidence from the record, and "[i]f the medical evidence is unclear, the Plan grants the Trustees, not the court, the discretion to resolve any conflicts and draw reasonable inferences from the record." *McCoy v. Holland*, 364 F.3d 166, 172 (4th Cir. 2004). The fact that the record here may have supported a finding in favor of Hill does not entitle me to substitute my judgment for that of the Trustees. I find that there is substantial evidence in the record to support the Trustees' finding that Hill's mining accident did not cause his mental disability consisting of a chronic anxiety problem, a chronic depressed condition, and mental retardation.

The Trustees' finding that Hill's mental retardation was not caused by the December 1, 1975, accident is clearly supported by substantial evidence. The medical determination that Hill was mentally retarded was based on the fact that Hill had an IQ score within a certain range deemed to be indicative of mental impairment. Mental retardation is a lifelong impairment that could not be linked to the mining accident.

- 18 -

Although not as clear-cut as the Trustees' decision regarding Hill's mental retardation, the Trustees' finding that Hill's anxiety and depression were not related to the December 1, 1975, back strain can also be supported with substantial evidence from the record. Several facts in the record indicate that Hill did not have a permanent impairment from his December 1, 1975, back strain. Hill did not seek any medical attention initially and worked for more than a month after the alleged accident. When Hill first sought medical treatment in January of 1976, he complained of back pain in the thoracic region of his back only. It was not until February of 1976 that Hill mentioned lower back and leg pain. Moreover, both Dr. Wycoff and Dr. Gardner found that at least some of Hill's back pain was secondary to old juvenile epiphysitis rather than back strain. Later orthopedic examinations by Drs. Davis, Pettigew, Henderson, and McFaddin failed to demonstrate any objective evidence of back problems.

Dr. Nelson, Hill's treating psychiatrist, did opine that Hill's anxiety and depression were caused by the December 1, 1975, back injury. However, the Supreme Court has made clear that "[ERISA] plan administrators are not obliged to accord special deference to the opinions of treating physicians," and thus the Trustees were not required to give any special weight to Hill's treating psychiatrist's opinion regarding the origin of the back pain. *Black & Decker v. Nord*, 538 U.S. 822, 825

(2003). Finding that the medical records from several orthopedic specialists indicated that there was no causal link between the December 1, 1975, accident and Hill's subsequent back condition, the Trustees naturally found also that the chronic anxiety and depression relating to the back condition could not be causally related to the mining accident.

It is also noteworthy that the date of disability set by the Social Security Administration was September 28, 1978, nearly three years after Hill's mine accident. The Fourth Circuit has traditionally considered the proximity of the date of disability to the date of the accident to be an important factor in determining whether the requisite causal link exists. *See Robertson v. Connors*, 848 F.2d 472, 475 n.5 (4th Cir. 1988); *Horn v. Mullins*, 650 F.2d 35, 37 (4th Cir. 1981). While this alone is not determinative, the long interval between the accident and the effective date of the disability coupled with the medical records regarding Hill's back condition provides substantial evidence upon which the Trustees could base their decision that Hill's mine accident did not render him disabled under the 1974 Pension Plan.

Based on these facts, I cannot say that the Trustees' decision was arbitrary and not based on substantial evidence.

Case 2:05-cv-00020-JPJ-PMS   Document 15   Filed 10/07/05   Page 20 of 21   Pageid#: 94

## V. CONCLUSION.

For the foregoing reasons, the defendants' Motion for Summary Judgment will

be granted and final judgment entered in their favor.

DATED: October 7, 2005

 /s/ JAMES P. JONES
Chief United States District Judge